# UNITED STATES DISTRICT COURT

for the

Middle District of North Carolina

__Greensboro_______ Division

FILED IN THIS OFFICE
JUN 23 2026
Clerk U.S. District Court Greensboro, NC
BY

| | | |
|---|---|---|
| Capree Ricketts<br><br>*Plaintiff(s)*<br>*(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | ) | Case No. 1:26CV574<br>*(to be filled in by the Clerk's Office)*<br><br>Jury Trial: *(check one)* ☑ Yes ☐ No |
| -v- | ) | |
| County of Guilford, Department of Social Services<br><br>*Defendant(s)*<br>*(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | ) | |

## COMPLAINT FOR A CIVIL CASE

### I. The Parties to This Complaint

#### A. The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Capree RIcketts |
| Street Address | 111 Lunsford Drive |
| City and County | Burlington |
| State and Zip Code | North Carolina 27217 |
| Telephone Number | 646-270-6084 |
| E-mail Address | capreericketts@yahoo.com |

#### B. The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | Department of Social Services( Child Welfare Agency) |
| Job or Title *(if known)* | Director of DSS -Guilford (Sharon Barlow) |
| Street Address | 1203 Maple Street |
| City and County | Greensboro Guilford |
| State and Zip Code | North Carolina 27405 |
| Telephone Number | 336-641-4967 |
| E-mail Address *(if known)* | sbarlow@guilfordcountync.gov |

Defendant No. 2

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 3

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 4

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

## II. Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case. In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

☑ Federal question ☐ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A. If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

Federal Regulations 45 C.F.R. § 84.60
Federal Statues
United States Constitution
Americans with Disabilities Act Title II
Rehabilitation Act of 1973 Section 504
Civil Rights Act 42 U.S.C. § 1983

### B. If the Basis for Jurisdiction Is Diversity of Citizenship

1. The Plaintiff(s)

a. If the plaintiff is an individual

The plaintiff, *(name)* Capree Ricketts, is a citizen of the State of *(name)* North Carolina.

b. If the plaintiff is a corporation

The plaintiff, *(name)* ______, is incorporated under the laws of the State of *(name)* ______, and has its principal place of business in the State of *(name)* ______.

*(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2. The Defendant(s)

a. If the defendant is an individual

The defendant, *(name)* ______, is a citizen of the State of *(name)* ______. Or is a citizen of *(foreign nation)* ______.

b. If the defendant is a corporation

The defendant, *(name)* Department of Guilford Social Services, is incorporated under the laws of the State of *(name)* North Caroliona, and has its principal place of business in the State of *(name)* North Carolina. Or is incorporated under the laws of *(foreign nation)* ______, and has its principal place of business in *(name)* Greensboro North Carolina.

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3. The Amount in Controversy

The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at stake–is more than $75,000, not counting interest and costs of court, because *(explain)*:

N/A

## III. Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

Plaintiff is a qualified individual with a disability within the meaning of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. Defendants are public entities and/or persons acting under color of state law.

Defendants knew or should have known of Plaintiff's disability and need for reasonable accommodations but failed to provide equal access to services, programs, activities, and benefits. Defendants discriminated against Plaintiff on the basis of disability and denied meaningful access to public services in violation of Title II of the ADA, Section 504 of the Rehabilitation Act, and applicable federal regulations, including 45 C.F.R. § 84.60 ( see complaint attached)

## IV. Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

Plaintiff requests that the Court enter judgment in Plaintiff's favor and grant the following relief:

A declaration that Defendants violated Plaintiff's rights under Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, 42 U.S.C. § 1983, and the Fourteenth Amendment.

Compensatory damages in an amount to be determined at trial for emotional distress, humiliation, pain and suffering, loss of family association, denial of equal access to services and programs, and injuries resulting from separation from Plaintiff's child.

The harms alleged are continuing because Plaintiff continues to experience the effects of the denial of accommodations, exclusion from meaningful participation in services and proceedings, and separation from Plaintiff's child. Plaintiff further alleges that the discriminatory practices and failure to accommodate have not been fully remedied and continue to affect Plaintiff's ability to access services and pursue reunification.

(see full complaint attached)

## V. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 06/23/2026

Signature of Plaintiff: Capree Ricketts

Printed Name of Plaintiff: Capree Ricketts

### B. For Attorneys

Date of signing: ____________

Signature of Attorney: ____________

Printed Name of Attorney: ____________

Bar Number: ____________

Name of Law Firm: ____________

Street Address: ____________

State and Zip Code: ____________

Telephone Number: ____________

E-mail Address: ____________

**IN THE UNITED STATES DISTRICT COURT FOR MIDDLE DISTRICT OF NORTH CAROLINA GREENSBORO DIVISON**

| | |
|---|---|
| **Capree Ricketts**, Plaintiff,<br><br>v.<br><br>COUNTY OF GUILDFORD, DEPARTMENT OF SOCIAL SERVICES<br><br>Defendant | Case No.<br><br>**COMPLAINT**<br><br>**(Jury Trial Demanded)** |

## INTRODUCTION

1. Plaintiff is an individual new parent with a documented disability within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 and seeks to end disability -based discrimination against the County of Guilford and Department of Social Services Guilford ; a child welfare agency located in Greensboro, North Carolina.

2. This action arises from the unconstitutional removal of Plaintiff's six-day-old newborn child by Guilford County Department of Social Services ("Guilford DSS") on September 27, 2023, and the continued deprivation of Plaintiff's federally protected rights throughout the juvenile dependency proceedings.

3. Plaintiff brings this action under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 et seq.; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; 45 C.F.R. § 84.60; and 42 U.S.C. § 1983 for violations of the Fourth & Fourteenth Amendment Due Process Clause.

4. In September of , 2023, Guilford DSS received a report from hospital personnel alleging that Plaintiff wanted to leave the hospital against medical advice following the birth of her child. Based solely on this allegation, DSS initiated an emergency removal of Plaintiff's newborn child from the Moses Cone Hospital located in Greensboro , North Carolina.

5. Plaintiff alleges that DSS acted under color of state law when it removed the child

without first obtaining a court order, without providing Plaintiff notice, and without a meaningful opportunity to be heard. DSS relied upon an allegation of "presumptive risk," despite DSS records identifying the risk level as moderate. The alleged justification for removal was not based on an actual inspection of the home, because the CPS investigator did not inspect or observe the residence prior to removal.

6. The allegation that Plaintiff lacked housing was inaccurate. Plaintiff had arranged a temporary placement and support system. A third-party provider provided an affidavit confirming that she went to the home, observed the conditions, met with Plaintiff and the newborn, and confirmed the environment was safe and appropriate.

7. Despite the absence of verified environmental danger and the existence of a safe alternative plan, DSS removed the newborn and continued to maintain custody beyond the time permitted by North Carolina law before obtaining judicial authorization. Plaintiff alleges that DSS failed to comply with the procedural protections required when the State interferes with a parent's fundamental liberty interest in the care, custody, and companionship of her child.

8. The United States Supreme Court has recognized that the parent-child relationship is a fundamental liberty interest protected by the Fourteenth Amendment. *See Santosky v. Kramer, 455 U.S. 745 (1982); Stanley v. Illinois, 405 U.S. 645 (1972); Troxel v. Granville, 530 U.S. 57 (2000).* The State may not separate a parent from a child without constitutionally adequate justification and procedures.

9. The constitutional violations did not end with the initial removal. DSS continued to rely upon the consequences of the initial removal throughout the dependency proceedings, including the Permanency Planning Hearing held on November 8, 2024. Plaintiff alleges that the November 8, 2024 hearing was the most recent manifestation of the continuing deprivation because DSS –Guilford continued to rely on the circumstances created by the unlawful removal when making recommendations and decisions affecting Plaintiff's parental rights.

10. In addition to the constitutional violations, Plaintiff alleges that DSS violated federal disability rights

11. laws by discriminating against Plaintiff based on disability. DSS treated Plaintiff's mental health status as evidence of parental unfitness rather than conducting an individualized assessment of Plaintiff's actual ability to safely parent with appropriate support and accommodations.

12. Title II of the ADA requires public entities, including child welfare agencies, to provide individuals with disabilities equal access to programs, services, and benefits. Section 504 of the Rehabilitation Act imposes similar obligations on entities receiving federal financial assistance. The regulations implementing Section 504, including 45 C.F.R. § 84.60, prohibit disability discrimination in programs and activities receiving federal funding.

13. Plaintiff alleges that DSS failed to provide reasonable modifications and accommodations necessary for Plaintiff to meaningfully participate in child welfare services and reunification efforts. Instead, DSS relied on disability-related assumptions and failed to distinguish between having a disability and being unable to safely parent.

14. Through these actions, Defendants deprived Plaintiff of equal access to child welfare services, denied Plaintiff procedural protections required by the Constitution, and interfered with Plaintiff's fundamental right to maintain a relationship with her child.

15. Plaintiff seeks relief for the unlawful conduct of Defendants under federal law, including damages, declaratory relief, injunctive relief, attorney's fees, and any other relief available.

16. Plaintiff is representing herself pro se in this matter under **28 U.S.C. § 1654** , the federal statute that governs the right to counsel and self-representation in United States courts. It establishes that parties in all federal courts may plead and conduct their own cases personally or by the assistance of counsel.

17. Plaintiff is a citizen of the United States of America and has been a resident of Alamance County for 8 years.

18. She lived with this documented disability for many years and is able to work and function as a productive member of society when provided with reasonable accommodations.

19. Prior to establishing residency in North Carolina, Plaintiff was a former resident of the State of New York. Plaintiff is a former Licensed Practical Nurse ("L.P.N.") licensed in the State of New York, License No. 292006.[1] Plaintiff's professional nursing license reflects her formal education, clinical training, and experience in the healthcare field.

20. As a Licensed Practical Nurse, Plaintiff received professional training and performed duties involving direct patient care, observation and monitoring of patient conditions, collection and communication of clinical information, administration of medications and treatments within the scope of practice, assisting with patient assessments, patient advocacy, communication with healthcare providers, and recognition of changes in medical conditions requiring appropriate intervention.

21. Plaintiff's professional background provided her with knowledge and experience in understanding medical information, communicating with healthcare professionals, evaluating healthcare recommendations, advocating for patient needs, and exercising independent judgment within the scope of her licensed role. Plaintiff's actions in questioning medical recommendations, seeking clarification, and advocating for herself and her newborn were consistent with her professional training and healthcare experience and should not have been mischaracterized by Defendants as evidence of neglect, lack of judgment, or parental unfitness.

---

[1] Plaintiff's New York Licensed Practical Nurse credential is identified as License No. 292006 and may be verified through the New York State professional licensing records.

22. Defendant(s) DSS-Guilford , acting under color of state law and/or as recipients of federal financial assistance, provided or administered child welfare-related services and proceedings affecting Plaintiff's parental rights and failed to offer reasonable accommodations although it was requested in a disposition a hearing on November 8,2024, June 11,2025 and ongoing alleged discrimination.

23. Plaintiff alleges that Defendant(s) failed to provide reasonable accommodations for Plaintiff's disability and violated Title II Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 et seq and The Child Welfare Agency's conduct violated not only Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, but also Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

24. As a recipient of federal financial assistance, the Agency was prohibited from excluding the Parent from participation in, denying the Parent the benefits of, or otherwise discriminating against the Parent on the basis of disability.

25. Beginning in September of , 2023, and continuing through the Permanency Planning Hearing held on November 8, 2024, the Agency failed to provide reasonable accommodations and reasonable modifications necessary for the Parent to meaningfully access reunification services, case planning, visitation, and court-related processes. The Agency nevertheless stated that because parent has a documented disability that she can not safely care for her minor child.

26. The violations were ongoing in nature and culminated in the November 8, 2024 Permanency Planning Hearing, rendering the Parent's claims timely and actionable.

27. Plaintiff previously filed an action in the North Carolina Superior Court, Case No. 25 CVS 0166, regarding violation of constitutional rights arising out of from related events and that case was dismissed for lack of subject matter jurisdiction .

28. Plaintiff has also filed administrative complaints with the United States Department of Justice and the Office for Civil Rights of the United States Department of Health and Human Services, identified as OCR-25-621848 and 26-6758848, which are currently

pending review and/or investigation.

29. A petition to terminate Plaintiff's parental rights was filed in or about May 2025 in connection with the underlying child welfare proceedings.

30. There is currently a termination proceeding remains pending and ongoing in the local District Court of Guilford County.

31. Plaintiff alleges that the continuation of these proceedings is occurring without adequate accommodation of Plaintiff's disability and without meaningful access to necessary supports and services required under federal disability law and 45 C.F.R. § 84.60 .

32. Plaintiff has made diligent efforts to obtain legal representation from attorneys experienced in child welfare and disability rights litigation in North Carolina and elsewhere, but has been unable to secure counsel that is trained in ADA Disability rights at this time.

33. Plaintiff proceeds pro se in this matter and is aware that this is unprecedented case; as no pro se litigant has ever filed in federal court with such a claim or within the United States of America.

34. Plaintiff prepared this Complaint with the assistance of publicly available legal resources ; including own confidential files , transcripts, and personal knowledge of this case. The use of technical assistance was also used format the complaint. Plaintiff did obtain legal assistance from ACLU-North Carolina and a widely known attorney in a different state for education on this claim.

35. NCED Pro Se Guide for foundational rules on civil procedure was also utilized to draft this complaint.

36. Plaintiff alleges that this matter presents highly unusual, complex, and fact-specific issues

arising at the intersection of federal disability rights law and ongoing child welfare proceedings affecting parental rights, including the application of disability accommodation requirements within state court processes.

37. Plaintiff further alleges that these circumstances are uncommon and have made it particularly difficult for Plaintiff to obtain legal representation and to litigate this matter without counsel.

38. Plaintiff alleges that the procedural posture and nature of the issues involved require careful judicial consideration due to the intersection of ongoing state proceedings and federal disability protections.

39. Plaintiff alleges that this case involves a rarely litigated combination of disability rights claims and ongoing child welfare proceedings, resulting in a complex factual and procedural context.

40. As a result of Defendant(s)' actions and omissions, Plaintiff has suffered and continues to suffer harm, including interference with parental rights, denial of equal access to services, and other injuries to be proven at trial.

41. Plaintiff brings this action against Guilford County under the doctrine established in Monell v. Department of Social Services, 436 U.S. 658 (1978), because the constitutional violations suffered by Plaintiff were caused by Guilford County's policies, customs, practices, failures to train, failures to supervise, and deliberate indifference to the federally protected rights of parents, including parents with disabilities.

42. At all relevant times, Guilford County, through its Department of Social Services ("Guilford DSS"), was responsible for the operation, supervision, training, and oversight of child protective services investigations, emergency removals, reunification efforts, and

decision-making affecting the fundamental rights of parents and children.

43. Guilford County had prior notice that deficiencies existed within its child welfare system before the removal of Plaintiff's newborn child. In the summer of 2023, the North Carolina Department of Health and Human Services required Guilford DSS to operate under a Corrective Action Plan addressing identified deficiencies within the agency's child welfare practices. The Corrective Action Plan identified concerns involving the quality and consistency of assessments, decision-making practices, documentation, supervision, and the need for additional training and oversight.

44. Despite this notice, Guilford County failed to implement adequate corrective measures, supervision, and training necessary to ensure that DSS employees conducted constitutionally adequate investigations, performed individualized assessments, followed required procedures, and complied with federal protections afforded to parents with disabilities.

45. The deficiencies identified through the Corrective Action Plan directly relate to the conduct experienced by Plaintiff. The same systemic failures continued when DSS employees removed Plaintiff's six-day-old newborn child in September of 2023.

46. DSS employees relied upon assumptions and unverified information rather than a complete and individualized assessment. The removal was initiated after DSS received a report from hospital personnel concerning Plaintiff's desire to leave the hospital against medical advice. DSS proceeded under a theory of "presumptive risk," even though agency documentation reflected a moderate risk assessment

47. DSS removed Plaintiff's newborn child without first verifying the alleged safety

concerns, without inspecting the home environment, and without considering available support systems and alternatives. The assertion that Plaintiff lacked appropriate housing was inaccurate. Plaintiff had arranged a temporary provider and support. The affidavit of temporary safety provider confirms that she visited the residence, observed the environment, met with Plaintiff and the newborn, and verified that the circumstances were safe and appropriate attached as an .

48. The conduct of DSS employees demonstrates the same failures identified through the Corrective Action Plan: inadequate assessment, reliance on assumptions rather than verified evidence, insufficient evaluation of safety factors, and decision-making that was not based upon an individualized review of the facts.

49. Guilford County also failed to adequately train and supervise DSS employees regarding the rights of parents with disabilities under the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and related federal requirements. DSS employees repeatedly relied upon mental health

50. diagnoses and disability-related information when evaluating Plaintiff's parental capacity rather than determining what accommodations, services, and supports were necessary to allow Plaintiff meaningful participation in the child welfare process.

51. Plaintiff's experience demonstrates that DSS employees lacked adequate training regarding disability accommodations and federal protections. Plaintiff requested accommodations, yet DSS failed to provide appropriate assistance or identify available services. A DSS employee's statement that she did not know what services or

accommodations to provide further demonstrates the County's failure to ensure employees understood their obligations under federal disability laws.

52. Disability-related assumptions and stereotypes were incorporated into decision-making affecting Plaintiff's parental rights. Rather than conducting an individualized assessment of Plaintiff's ability to safely parent with appropriate supports, DSS relied upon generalized conclusions regarding mental health and disability.

53. The continued impact of these systemic failures is reflected in DSS records, including case notes prepared by cps investigator , which document the information relied upon, the reasoning used, and the circumstances surrounding DSS's actions. The November 8, 2024 Permanency Planning Hearing transcript further demonstrates the continuation of these practices, including continued reliance upon prior agency decisions and the ongoing denial of requested accommodations.

54. Guilford County's failure to properly train, supervise, monitor, and correct these practices amounted to deliberate indifference to the constitutional and statutory rights of parents. The County knew or should have known that inadequate training and oversight created a substantial risk that DSS employees would deprive parents of their constitutional rights and deny equal access to services required under federal disability laws.

55. The actions taken against Plaintiff were not merely the result of one employee's mistake or isolated conduct. They were the predictable result of Guilford County's failure to

correct known deficiencies within its child welfare system. Guilford County's policies, customs, practices, failures to train, and failures to supervise were the moving force behind the deprivation of Plaintiff's Fourteenth Amendment rights.

56. The Parent respectfully contends that the Child Welfare Agency's violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 et seq., were not isolated events but constituted an ongoing pattern of discrimination beginning on September 27, 2023, and continuing through the Permanency Planning Hearing held on November 8, 2024. The November 8, 2024 hearing constitutes an actionable occurrence within the applicable limitations period because the discriminatory conduct continued to affect the Parent's ability to participate meaningfully in reunification services and court proceedings.

## I. TITLE II OF THE ADA APPLIES TO CHILD WELFARE AGENCIES AND JUVENILE COURT PROCEEDINGS

57. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132.

58. Public child welfare agencies are public entities subject to Title II and are required to make reasonable modifications to policies, practices, and procedures when necessary to avoid discrimination on the basis of disability. See 28 C.F.R. § 35.130(b)(7).

59. Federal courts have recognized that state agencies involved in child welfare and family regulation

60. are subject to Title II of the ADA. See Tennessee v. Lane, 541 U.S. 509 (2004) (holding that Title II applies to access to judicial services and court proceedings); Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206 (1998) (Title II broadly applies to state programs and services).

## II. THE VIOLATIONS WERE CONTINUING IN NATURE

61. The violations began on or about September of , 2023, when the Child Welfare Agency first failed to provide reasonable accommodations and failed to modify its services, programs, or reunification requirements to account for the Parent's disability.

62. Thereafter, the Agency continued to impose the same requirements, recommendations, and permanency-related conditions without providing reasonable accommodations, despite knowledge of the Parent's disability and resulting limitations. Each review hearing, case-plan review, service requirement, and permanency proceeding reflected the continuing effects of the Agency's failure to comply with Title II.

63. The discriminatory conduct culminated during the Permanency Planning Hearing held on November 8, 2024. At that hearing, the Agency relied upon information, assessments, service compliance findings, and reunification-related determinations that had been developed through a process allegedly tainted by its continuing failure to provide

reasonable accommodations required under federal law.

## III. THE NOVEMBER 8, 2024 PERMANENCY PLANNING HEARING CONSTITUTES AN INDEPENDENT ACTIONABLE EVENT AND WHEN PLANITFF ALLEGES VIOLATIONS OF ADA OCCURRED.

64. Even if earlier violations occurred beginning in September 2023, the Parent's claim is timely because the discriminatory conduct continued through the November 8, 2024 Permanency Planning Hearing.

65. Under the continuing violation doctrine, where discriminatory acts are part of an ongoing pattern rather than isolated incidents, a claim may encompass conduct occurring before the limitations period when at least one discriminatory act occurred within the limitations period.

66. The November 8, 2024 hearing was not merely the lingering effect of prior conduct. Rather, it was a new and discrete proceeding in which the Agency allegedly continued to deny the Parent meaningful access to services, participation, reunification efforts, and the benefits of the child welfare process because reasonable accommodations had not been provided.

67. Accordingly, the Parent's ADA claim accrued, at the latest, on November 8, 2024, when the Agency continued to rely upon and benefit from its prior failures to accommodate and

when the resulting prejudice was reaffirmed through permanency planning determinations affecting the Parent's fundamental rights.

**<u>IV. THE FAILURE TO PROVIDE REASONABLE ACCOMMODATIONS UNDERMINED REASONABLE REUNIFICATION EFFORTS .North Carolina law requires reasonable efforts toward reunification except where specifically relieved by statute. N.C. Gen. Stat. §§ 7B-901 and 7B-906.2.</u>**

68. When a parent has a qualifying disability, reasonable reunification efforts must be implemented in a manner consistent with federal disability law. A child welfare agency cannot satisfy its obligations by offering services that a disabled parent cannot meaningfully access because of the agency's failure to provide reasonable modifications.

69. Where an agency evaluates parental progress without first providing legally required accommodations, findings concerning compliance, progress, capacity, or reunification may be fundamentally unreliable because the parent was denied an equal opportunity to benefit from the services being measured.

70. The Child Welfare Agency's conduct violated not only Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, but also Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. As a recipient of federal financial assistance, the Agency was prohibited from excluding the Parent from participation in, denying the Parent the benefits of, or otherwise discriminating against the Parent on the basis of disability.

71. Beginning on September 27, 2023, and continuing through the Permanency Planning Hearing held on November 8, 2024, the Agency failed to provide reasonable

accommodations and reasonable modifications necessary for the Parent to meaningfully access reunification services, case planning, visitation, and court-related processes. The Agency nevertheless relied upon the Parent's alleged noncompliance and lack of progress when making recommendations affecting permanency and reunification. Because the Parent was evaluated through a process that failed to comply with Title II and Section 504, any findings concerning the Parent's progress, capacity, compliance, or ability to reunify were necessarily influenced by discriminatory practices. The violations were ongoing in nature and culminated in the November 8, 2024.

-

---

- North Carolina Office of State Budget and Management, *Most Counties Share in NC's Continued Growth* (Nov. 8, 2024), available at: North Carolina Office of State Budget and Management – Most Counties Share in NC's Continued Growth.
- North Carolina Juvenile Code, N.C. Gen. Stat. §§ 7B-500 et seq. (governing nonsecure custody, emergency removal procedures, juvenile petitions, and related child welfare proceedings).
- *Guilford County Juvenile Court Case No. 25 CVS 0166* (pending state court proceedings).
- North Carolina Department of Health and Human Services, Division of Social Services, *Guilford County Department of Social Services Corrective Action Plan* (approved July 14, 2023). The Corrective Action Plan identified deficiencies within Guilford County DSS child welfare operations, including concerns involving assessment practices, documentation, supervision, training, case decision-making, and compliance with child welfare policy and procedures. Available at: Guilford County Department of Social Services Corrective Action Plan (Approved July 14, 2023).
- Administrative civil rights complaints submitted to the U.S. Department of Justice and the U.S. Department of Health and Human Services, including OCR Complaint No. OCR-25-621848 and HHS OCR Complaint No. 26-6758848

## JURISDICTION AND VENUE

1. Plaintiff's claims pursuant to Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 et seq., and Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794 et seq .

2. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983,1985, and 1986.

3. This Court also has jurisdiction pursuant to 28 U.S.C. § 1343(a)(3) and (a)(4), which provide jurisdiction over civil actions seeking redress for the deprivation, under color of state law, of rights secured by the Constitution and federal statutes.

4. Plaintiff's claims for declaratory and injunctive relief are authorized under 28 U.S.C. §§ 2201 and 2202.

5. Plaintiff seeks injunctive and declaratory relief to prevent ongoing and future violations of federal law and constitutional rights, as well as all other relief this Court deems just and proper.

6. Plaintiff alleges that Defendant receives federal financial assistance through the U.S. Department of Health and Human Services and is therefore subject to Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and its implementing regulations, including 45 C.F.R. Part 84, which prohibit discrimination against qualified individuals with disabilities and require reasonable modifications to ensure equal access to federally funded programs and services.

7. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a

substantial part of the events or omissions giving rise to the claims occurred in this district, including the removal of Plaintiff's minor child, the provision of child welfare services, and related administrative and judicial proceedings conducted by Defendant Guilford County Department of Social Services.

Defendant Guilford County Department of Social Services is located within this judicial district and performed the actions complained of herein within this district.

## PARTIES

1. Plaintiff Capree Ricketts ("Plaintiff") is the biological mother of the minor child at issue in this action. Plaintiff is the parent of the minor child referenced in this Complaint as "Kyran" for confidentiality purposes. At all relevant times, Plaintiff possessed a constitutionally protected liberty interest in the care, custody, and control of her child.

2. The minor child at issue in this action is referred to herein as "Kyran" to protect the child's identity and privacy.

3. Defendant Guilford County, North Carolina, is a local governmental entity responsible for the operation, funding, supervision, and administration of the Guilford County Department of Social Services ("DSS"), including child welfare investigations, foster care placement, and reunification services. Plaintiff alleges that Guilford County is subject to liability under 42 U.S.C. § 1983 for constitutional violations caused by its policies, customs, practices, and failures to train or supervise, consistent with Monell v. Department of Social Services.

4. Defendant Guilford County Department of Social Services ("DSS") is a governmental agency operating under Guilford County responsible for child protective services, foster care placement, and family reunification services. DSS is a public entity subject to suit under 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act.

5. Defendant Guilford County's Department of Social Services( DSS-Guilford) has physical and legal custody of " Kyran".

## FACTUAL ALLEGATIONS

1. The September of 2023, Plaintiff gave birth at the Moses Cone Hospital to a newborn child named " Kryan".
2. Past the critical 24-hours postpartum mark, the new born exhibited rapid breathing shortly after birth. Plaintiff , Capree Ricketss formally requested a neonatal infection workup and an immediate transfer to the on-site Neonatal Intensive Care Unit( NICU).
3. This was verbalized to hospital staff after signing against medical advice.
4. Concerned by the active withholding on necessary medical care, plaintiff wanted to leave against just observing the child past the 24 hours mark.
5. Plaintiff prior to any physical removal of the child from the building, Plaintiff physically signed Leaving Against Medical Advice and then decided not to leave against medical advice after the hospital protocol was explained to her in detail.
6. Hospital staff are mandated reporters and contacted Child welfare services that same day.
7. Plaintiff wrote besides signature on AMA paperwork( RESCIND) and .
8. Upon information and belief , this original hospital word " RESCIND " is also submitting under seal in this complaint ( Exhibit A Under Seal). 9
9. Child was taken in September of 2023 and remains in DSS –Guildford without providing plaintiff due process of the law, without providing reasonable accommodation and upon information and belief removed the child from plaintiff because of a documented disability.
10. Upon information and belief intentionally withweld case notes , assessments and information from each and every judge who has presided over this case.

11. Plaintiff contends that DSS-Guilford violated the fourth and fourteen amendment and participates in a custom practice of removing children from parent when the Department discovers that the parent has a documented disability .

12. This is not an isolated occurrence but an ongoing occurrence of indifference to correctly train and supervise its social workers.

13. The DSS Guilford should have known the difference between real and imminent risk apart from moderate but instead relied on assumptions and stereotypes in this case in violation of 45 c.f.r 84.60 which prohibits discrimination of any kind in child welfare cases.

**Notice of Sealed Filing of Exhibit's**

1. Because this matter involves a state juvenile dependency proceeding , all core supporting documentary evidence file been filed UNDER SEAL to protect the confidentiality of the child in under custody.
2. A motion to Seal these exhibits have also been filed in this complaint
3. Exhibits include hospital record of Signed Leaving Against Medical Advice( Exhibit A)
4. Case notes noting risks to the child " MODERATE"(Exhibit B_
5. Transcripts of alleged violations of ADA & 45 C.F.R.84.60 on November 8,2024( Exhibit C)
6. Affidavit of Support of Temporary Safety Provider(Exhibit D)

## PRELIMINARY STATEMENT OF FACTS

1. No family forgets the moment it is torn apart. When agents of the Department of Social Services ("DSS") barge into a mother's hospital bedroom home, claiming that an emergency requires them to forcibly take a child from their parent, the agency inflicts indelible

   trauma on children and parents. These seizures—which predominantly and disproportionally

   target the Black families—frequently occur in when there is no father present and when DSS- Guilford knows that parent has a documented disability. .

   In the plaintiff case has a documented disability which DSS- Guilford County knew of and removal the child for this reason . No information was provided on why the child would be removed from plaintiff's care. Only vague statements such as "safety concerns" . DSS- Guildford is the third largest population in the State of North Carolina .

2. The county was currently under a corrective action plan when the child came into their care. There was no harm done to this infant . Only a suspicion of parental unfitness due to documented disability. Parents have a constitutional right to the care and control of there children, however, *Parens Patriae* allows for the state to intervene if harm is suspected. After seizing children, DSS routinely fails to provide a clear reason for removal to parents.

3. The doctrine of **Parens Patriae** recognizes the State's authority and responsibility to protect children and intervene when circumstances demonstrate that a child's

health, safety, or welfare may be at risk. Under this doctrine, the State acts in a protective capacity as the guardian of those who are unable to protect themselves.[1] However, the authority granted under parens patriae is not unlimited and must be exercised within constitutional boundaries.

4. DSS-Guilford is an agency that is authorized to conduct child removals for only 12-hours under North Carolina 7B statues. After 12 hold is up, child is suppose to be returned .In this case, the child was already removed and place in foster care. The county must file a petition and ask the court for a non secure custody which tells the court the child is in imminent risk of harm .

5. Parents are suppose to have a hearing , present evidence, and be served a notice. In this case ,like many cases this never happened. DSS-Guilford routinely serves Non secure custody hearings after the child/children have been removed. The petition was still being written the same day as the hearing. Parents especially Black with documented disabilities have no time to form a defense. Often times are told by court appointed attorneys to say that they are guilty. This is a common practice that occurs. When the parent is single and has a mental health the diagnosis automatically parental unfitness is assumed and ***Parens Patriae*** is invoked.

## EMERGENCY REMOVAL POLICY AND NONSECURE CUSTODY VIOLATIONS

1. Plaintiff alleges that Guilford County Department of Social Services ("DSS") removed Plaintiff's minor child under emergency removal authority without a prior court order.

2. North Carolina law governing nonsecure custody under Chapter 7B permits a brief emergency hold in limited circumstances, and requires that after an initial emergency

removal period, DSS must seek a court order for nonsecure custody in order to continue holding the child in its care. Defendants, acting under color of state law, violated Plaintiff's rights secured by the Fourth and Fourteenth Amendments by removing Plaintiff's child without adequate legal justification and maintaining custody of the child beyond the statutory time period without an active court order authorizing continued deprivation of custody.

3. Plaintiff alleges that in this case, the child was removed and held beyond the initial emergency period without DSS obtaining a written court order authorizing continued nonsecure custody.

4. Plaintiff alleges that the child remained in DSS custody without timely judicial authorization for continued removal, despite the requirement under Chapter 7B that DSS seek and obtain court approval to continue custody beyond the emergency period.

5. Plaintiff alleges that no valid written court order was in place during the period in which the child remained in DSS custody beyond the initial emergency removal.

6. Plaintiff alleges that DSS relied on generalized "safety concerns" rather than individualized findings of imminent risk when initiating emergency removal and maintaining custody.

7. Plaintiff alleges that DSS's continued custody of the child without timely judicial authorization deprived Plaintiff of custody without lawful process.

## C. Discriminatory Application of Emergency Removal Procedures

9. Plaintiff alleges that DSS's use of emergency removal procedures occurred while DSS had knowledge of Plaintiff's disability, including documented mental health history and Plaintiff's communications regarding accommodation needs.

10. Plaintiff alleges that DSS referenced Plaintiff's mental health history and related concerns in evaluating risk and making removal-related decisions.

11. Plaintiff alleges that DSS did not provide reasonable accommodations requested by Plaintiff in connection with reunification services, visitation, or case planning but instead on relied on generalized classifications and disability-related assumptions rather than individualized assessment in evaluating Plaintiff's parenting capacity and safety risk.The emergency removal practices and continued custody decisions were applied in a manner that resulted in differential treatment of Plaintiff compared to similarly situated parents without disability-related classifications.

**FOOTNOTE**

1. N.C. Gen. Stat. Chapter 7B (nonsecure custody framework); see also Initial Removal of a Child from a Home Because of Suspected Abuse, Neglect, or Dependency, N.C. Gen. Stat. § 7B-504 (as amended), North Carolina School of Government, University of North Carolina at Chapel Hill, https://civil.sog.unc.edu/2015/06/24/initial-removal-of-a-child-from-a-home-because-of-suspected-abuse-neglect-or-dependency-amended-g-s-7b-504/

## Deliberate Indifference to Constitutional and Statutory Rights

1. On information and belief, Defendant Guilford County Department of Social Services ("DSS") was aware that emergency removal of a child under North Carolina General Statutes Chapter 7B is permissible only in narrowly defined circumstances involving an immediate and substantial risk of harm, and that such authority must be exercised only as an exception to the general requirement of judicial oversight.

2. Defendant was further aware that the United States Constitution protects the fundamental liberty interest of parents in the care, custody, and control of their children, and that any governmental interference with that right must comply with due process requirements.

3. In Santosky v. Kramer, the Supreme Court held that the State must provide fundamentally fair procedures before interfering with or severing parental rights, recognizing the profound constitutional protection afforded to family integrity.

4. In Troxel v. Granville, the Supreme Court reaffirmed that the right of parents to make decisions concerning the care, custody, and control of their children is a fundamental liberty interest protected by the Fourteenth Amendment.

5. Despite this clearly established legal framework, Defendant implemented and maintained practices that allowed emergency removal procedures to be used in circumstances lacking evidence of imminent danger, including cases involving parents with documented disabilities and medical disputes that did not present

immediate risk of harm.

6. Defendant was also aware, or should have been aware, that under the Americans with Disabilities Act it is unlawful to deny services, programs, or benefits—or to fail to provide reasonable modifications—on the basis of disability, including in the context of child welfare investigations and reunification services.

7. Plaintiff alleges that Defendant failed to provide Plaintiff with reasonable modifications to the case plan or reunification services, and instead applied standardized procedures that did not account for Plaintiff's disability or individual circumstances.

8. On information and belief, Defendant had actual or constructive knowledge that its use of emergency removal authority and non-individualized case planning practices created a substantial risk of violating parents' constitutional and statutory rights, yet failed to modify its conduct.

9. Defendant's failure to adjust its policies, training, or practices in light of these known risks constitutes deliberate indifference to Plaintiffs' rights under the Fourteenth Amendment and federal disability law.

10. As a direct and proximate result of Defendant's deliberate indifference, Plaintiff was deprived of her fundamental liberty interest in the care, custody, and control of her child without constitutionally adequate process and without lawful disability accommodations .

11. DSS invokes an emergency rationale for extrajudicial removals at a shockingly high rate. DSS's own reports show that year after year, DSS conducts around 50% of all removals without a court order. In each of the years from October 2006 to 2016

According to the Fostering Court Improvement (FCI) reporting system for Guilford County:

12. Total removals to foster care: 253 children Rate: 20.6 per 10,000 children (state rate: 24.1 per 10,000 children.

13. DSS removed roughly 1,400-1,500 families with documented disabilities. The judge does not find a legal justification for the child to remain in state custody, the child must be returned but that rarely happens.

14. About 30 days after removal DSS-Guilford provides a standard case plan.

15. This case plan was never modified to be in accordance with the American with Disability Act. The law permits a narrow exception to this requirement of judicial review prior to this exception is known as an "emergency removal."

16. To ensure that DSS executes these only in the most urgent and dangerous circumstances. Nonetheless, DSS systematically removes children whenever the parent has a documented disability. North Carolina nor Federal Law clearly states that a child can not be removed because of a document disability. Rather than making children safer , DSS Emergency Removal Policy harms families.

## C. Systemic Practice, Corrective Action Notice, and Pattern of Emergency Removals

17. The conduct described in the Emergency Removal Policy and Nonsecure Custody Violations section reflects a broader and recurring practice within Guilford County Department of Social Services ("DSS"), not limited to Plaintiff's case.

18. Across cases, DSS operates in a manner in which emergency removal authority is used alongside continued state custody based on generalized safety concerns,

without timely individualized judicial authorization or meaningful reassessment of whether continued separation is justified.

19. This pattern did not arise in isolation. In May 2023, the North Carolina Department of Health and Human Services issued a Corrective Action Plan to Guilford County DSS following a state review of multiple CPS and permanency cases, including a child fatality case.

20. That review identified systemic deficiencies in investigations, documentation practices, supervisory oversight, permanency planning, and individualized decision-making.

21. The Corrective Action Plan placed DSS on clear notice that its child welfare practices required correction, particularly in the areas of individualized assessment, documentation integrity, supervisory review, and permanency-related decision-making.

22. Despite that notice, DSS continued to engage in emergency removals and continued custody practices marked by reliance on generalized risk language, limited individualized findings, and insufficient procedural safeguards ensuring prompt judicial oversight of continued detention.

23. Plaintiff's case reflects those same structural deficiencies: reliance on generalized "safety concerns," absence of documented individualized determinations of imminent risk, and failure to meaningfully reassess custody after the initial emergency removal phase.

24. The broader context is reflected in statewide child welfare data compiled through the Fostering Court Improvement reporting materials for the 2015–2016 reporting period, which shows that removals in North Carolina frequently arise from categorical and generalized risk classifications rather than narrowly defined findings of imminent physical harm, including neglect, caretaker substance use, caregiver inability to cope, and inadequate housing.[1]

25. Within that framework, "caregiver inability to cope" appears as a recurring removal classification. It is not a medical diagnosis or standardized clinical determination, but rather a discretionary label applied by child welfare personnel based on subjective assessments of perceived parental functioning.

26. The label functions as a flexible category that may incorporate judgments about mental health history, emotional regulation, disability-related functioning, socioeconomic conditions, or perceived parenting capacity, without requiring objective clinical evaluation or uniform criteria.

27. Because of that flexibility, "inability to cope" can operate as a proxy classification that substitutes for individualized findings of imminent harm, particularly where decision-making relies on generalized impressions rather than documented evaluation.

28. DSS practices in Plaintiff's case mirror these broader patterns. The case reflects reliance on generalized safety descriptors and parental capacity judgments that are not grounded in documented individualized assessments of actual imminent risk.

29. When viewed alongside statewide data and the Corrective Action Plan, the repeated

use of categorical descriptors such as "inability to cope" reflects a system in which discretionary labels replace individualized determinations, increasing the risk of inconsistent and non-uniform application across families in similar circumstances.

30. Emergency removal followed by prolonged custody without timely judicial correction or meaningful reassessment is not an isolated feature of Plaintiff's case, but a recurring

operational pattern within DSS practice.

31. The result is repeated separation of children from parents without sufficient individualized findings of imminent danger and without timely procedural correction once custody is transferred.

32. DSS's continued use of emergency removal authority under these conditions, even after notice of systemic deficiencies, reflects a pattern consistent with municipal policy or custom rather than isolated error.

33. Guilford County DSS is responsible for ensuring that its child welfare practices comply with constitutional requirements, including individualized decision-making and timely judicial oversight.

34. Despite notice through the Corrective Action Plan and publicly documented child welfare reform concerns reflected in court improvement materials, DSS did not implement effective corrective measures sufficient to prevent recurrence of emergency removals without adequate procedural safeguards.

35. The Supreme Court has long recognized that parents possess a fundamental liberty interest in the care, custody, and control of their children that cannot be infringed

without constitutionally adequate procedural protections. Santosky v. Kramer; Troxel v. Granville.

36. Due process requires safeguards designed to reduce the risk of erroneous deprivation of fundamental rights, including individualized decision-making and meaningful review of governmental action affecting custody. Mathews v. Eldridge.

37. North Carolina law governing nonsecure custody reflects these principles by limiting emergency removal to temporary circumstances requiring prompt judicial involvement and continued court authorization for custody to be maintained. N.C. Gen. Stat. Chapter 7B; see also Initial Removal of a Child from a Home Because of Suspected Abuse, Neglect, or Dependency, N.C. Gen. Stat. § 7B-504 (as amended), North Carolina School of Government, University of North Carolina at Chapel Hill, https://civil.sog.unc.edu/2015/06/24/initial-removal-of-a-child-from-a-home-because-of-suspected-abuse-neglect-or-dependency-amended-g-s-7b-504/.

---

[1] Fostering Court Improvement (FCI), North Carolina Statewide Reporting Data (2015–2016 reporting period), available at https://fosteringcourtimprovement.org/nc/summary1.shtml (reflecting that removals were frequently based on neglect, caretaker substance use, caregiver inability to cope, and inadequate housing, demonstrating widespread use of categorical risk classifications in child removal decision-making).

## STATEMENT OF FACTS

# Background and Removal of Plaintiff's Child

1. Plaintiff, Ms. Ricketts, is the biological mother of the minor child involved in the underlying juvenile dependency proceedings initiated by Guilford County Department of Social Services ("Guilford DSS").
2. Plaintiff's child was born in September of 2023. The child was removed from Plaintiff's custody on September 27, 2023 from Moses Cone Hospital .
3. Prior to establishing residency in North Carolina, Plaintiff was a former resident of the State of New York. Plaintiff is a former Licensed Practical Nurse ("L.P.N.") licensed in the State of New York, License No. 292006. Plaintiff's professional training included direct patient care, monitoring and documenting patient conditions, communicating clinical information, patient advocacy, and exercising professional judgment within the scope of nursing practice.
4. **PLAINTIFF AS A QUALIFIED INDIVIDUAL WITH A DISABILITY AND DEFENDANTS' KNOWLEDGE**
5. Plaintiff alleges that she is a "qualified individual with a disability" within the meaning of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, in that she has a physical and/or mental impairment that substantially limits one or more major life activities, and she is otherwise qualified to participate in child welfare services, reunification services, and court-related proceedings administered by Defendants.
6. Plaintiff further alleges that she is capable of and was actively engaged in participating in parenting services, reunification planning, visitation, and court-ordered services, but

required reasonable modifications and accommodations in order to meaningfully access and benefit from those services on an equal basis.

7. Plaintiff alleges that Defendants had actual knowledge of Plaintiff's disability and disability-related limitations throughout the pendency of this case.

8. Plaintiff's disability status and related limitations were repeatedly communicated directly to Defendants by Plaintiff during DSS involvement, including during investigations, case planning meetings, and court-related proceedings.

9. Plaintiff alleges that her disability and related needs were documented in DSS case notes, CPS investigative records, and internal DSS records maintained by Defendant Guilford County Department of Social Services.

10. Plaintiff further alleges that her disability status and related limitations were referenced and memorialized in court transcripts and court-related proceedings arising from this matter.

11. Plaintiff also alleges that she submitted multiple written requests for reasonable accommodations, including requests communicated through email correspondence with DSS personnel, in which she sought modifications to visitation, reunification services, scheduling, and evaluative requirements due to her disability-related limitations.

12. Plaintiff alleges that Defendants were therefore on actual notice of Plaintiff's disability and her need for reasonable modifications under the ADA and Section 504.

13. Despite this knowledge, Plaintiff alleges that Defendants failed to provide reasonable accommodations, failed to modify standard procedures, and instead required Plaintiff to comply with uniform requirements that did not account for her disability.

14. Plaintiff alleges that Defendants regarded and treated Plaintiff as having a disability and

used disability-related assumptions in evaluating Plaintiff's parenting capacity, including referencing Plaintiff's diagnosis and perceived limitations in case-related communications and decision-making.

15. Plaintiff alleges that Defendants' failure to provide reasonable accommodations, despite actual knowledge of Plaintiff's disability and repeated requests, constitutes discrimination on the basis of disability under Title II of the ADA and Section 504 of the Rehabilitation Act.

16. Guilford DSS became involved with Plaintiff and her newborn child after receiving a report from hospital personnel concerning Plaintiff's desire to leave the hospital against medical advice following childbirth.

17. Following receipt of that report, Guilford DSS initiated an investigation and removed Plaintiff's newborn child based upon allegations of risk.

18. DSS proceeded under a theory of presumptive risk despite documentation reflecting a moderate risk assessment.

19. Prior to removal, DSS did not inspect or directly observe Plaintiff's home environment.

20. DSS relied upon information and assumptions regarding Plaintiff's housing situation. Plaintiff had arranged a temporary provider and support system.

21. Temporary Safety provided an affidavit stating that she visited the residence, observed the home environment, met with Plaintiff and the newborn child, and verified that the environment was safe and appropriate.

22. Plaintiff did not seek to avoid reunification services. Plaintiff consistently expressed her desire to reunify with her child and requested the opportunity to participate in services, address concerns identified by DSS, and demonstrate her ability to safely parent.

23. Plaintiff sought assistance, guidance, and meaningful participation in the reunification process.

24. Plaintiff contends that DSS removed the child on September 27, 2023, and continued to maintain custody of the child beyond twelve (12) hours without an active court order authorizing continued custody.

25. Plaintiff was not provided timely notice of a hearing prior to the continued deprivation of custody.

## B. Plaintiff's Disability and Defendants' Knowledge

14. During the child welfare proceedings, Defendants became aware that Plaintiff had a documented mental health disability .

15. Plaintiff's mental health diagnosis became a central focus of DSS's concerns regarding reunification.

16. Instead of evaluating Plaintiff's actual parenting abilities, progress, strengths, and ability to parent with appropriate supports, Defendants relied upon Plaintiff's diagnosis as a basis for questioning her parental capacity.

17. Plaintiff requested meaningful participation in the reunification process and requested support, flexibility, and accommodations related to her disability.

18. Defendants failed to engage in an individualized assessment of Plaintiff's needs and failed to determine what reasonable supports, services, or modifications would allow Plaintiff equal access to reunification services.

19. Plaintiff's disability was treated as a barrier to reunification rather than evaluating what accommodations or supports would assist Plaintiff in successfully reunifying with her child.

## C. Guilford County DSS Corrective Action Plan and Agency Deficiencies

20. Before Plaintiff's child was removed, Guilford DSS was operating under a Corrective Action Plan issued by the North Carolina Department of Health and Human Services in 2023.

21. The Corrective Action Plan identified deficiencies within Guilford DSS child welfare operations, including concerns regarding assessments, documentation, supervision, training, and decision-making practices.

22. Despite the existence of these identified deficiencies, Plaintiff's case involved similar issues, including reliance on incomplete information, inadequate assessment of circumstances, failure to verify allegations, and decision-making based upon assumptions.

23. Upon information and belief DSS records, including case notes prepared by cps investigator, documented the information considered by DSS, the reasoning used in decision-making, and the circumstances surrounding the removal and continued involvement of DSS.

24. Plaintiff's evidence includes DSS case records, the affidavit of Temporary Safety Provider , and hearing transcripts supporting Plaintiff's claims regarding the basis for removal, continued custody, disability-related decision-making, and denial of requested accommodations.

25. Plaintiff brings this action based upon the deprivation of rights secured by the United States Constitution and federal law.

## Statement of Claim ONE

**Violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and 45 C.F.R. § 84.60 Against the Public Entity Receiving Federal Financial Assistance**

1. Plaintiff incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

2. Congress passed the Rehabilitation Act in 1973, and Section 504 of the Act provides that:

"[N]o otherwise qualified individual with a disability in the United States shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

29 U.S.C. § 794(a).

3. Section 504 applies specifically to programs receiving federal funds, executive agencies, and the United States Postal Service. 29 U.S.C. § 794.

4. Section 504 applies broadly and prohibits "any program or activity" that receives federal financial assistance from discriminating against a qualified individual with a disability. 29 U.S.C. § 794(a).

5. The term "program or activity" includes all operations of a department, agency, special purpose district, or other instrumentality of a State or local government, or any entity of such State or local government that receives federal financial assistance. 29 U.S.C. § 794(b).

6. While Congress has amended Section 504 on multiple occasions, it has never departed

from the Act's core purpose: to allow individuals to participate in programs and services free from discrimination based on disability. The Supreme Court has recognized that interpretations of Section 504 must give effect to the statute's objectives while remaining within manageable bounds. *Alexander v. Choate*, 469 U.S. 287, 299 (1985).

7. The Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq., was enacted in 1990 and contains similar protections that are interpreted consistently with Section 504. The ADA provides that nothing in the ADA shall be construed to apply a lesser standard than the standards applied under Section 504. 42 U.S.C. § 12201(a).

8. The Rehabilitation Act and the ADA share the same definition of disability. Disability includes:

1. a physical or mental impairment that substantially limits one or more major life activities;
2. a record of such an impairment; or
3. being regarded as having such an impairment.

42 U.S.C. § 12102(1).

9. A qualified individual is an individual who meets the eligibility requirements for participation in the program or activity receiving services. 29 C.F.R. § 32.3.

10. Guilford County Department of Social Services ("DSS") operates a child welfare program receiving federal financial assistance and is subject to Section 504 and its implementing regulations, including 45 C.F.R. § 84.60.

The Final Rule specifically provides:

"No qualified individual with a disability shall, on the basis of disability, be excluded

from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any child welfare program or activity that receives Federal financial assistance."

45 C.F.R. § 84.60(a)(1).

The Final Rule further prohibits decisions based on:

"speculation, stereotypes, or generalizations that a parent, caregiver, foster parent, or prospective parent, because of a disability, cannot safely care for a child."

45 C.F.R. § 84.60(a)(2)(i).

11. The regulation further prohibits denying a qualified parent with a disability custody or control of, or visitation to, a child and prohibits denying a qualified parent with a disability the opportunity to participate in or benefit from child welfare services, including family preservation and reunification services, equal to that afforded to persons without disabilities. 45 C.F.R. § 84.60(b)(1)-(2).

12 During the child welfare proceedings, Defendants were aware that Plaintiff had a mental health disability. Plaintiff's mental health diagnosis became a central focus of DSS's concerns regarding reunification. Instead of evaluating Plaintiff's actual parenting abilities, progress, strengths, and ability to parent with appropriate supports, Defendants relied upon Plaintiff's diagnosis as a basis for questioning Plaintiff's parental capacity.

13 Plaintiff sought meaningful participation in the reunification process and requested support, flexibility, and accommodations related to her disability.

Defendants failed to engage in an individualized assessment of Plaintiff's needs and failed to determine what reasonable supports or modifications would allow Plaintiff

from the Act's core purpose: to allow individuals to participate in programs and services free from discrimination based on disability. The Supreme Court has recognized that interpretations of Section 504 must give effect to the statute's objectives while remaining within manageable bounds. *Alexander v. Choate*, 469 U.S. 287, 299 (1985).

7. The Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq., was enacted in 1990 and contains similar protections that are interpreted consistently with Section 504. The ADA provides that nothing in the ADA shall be construed to apply a lesser standard than the standards applied under Section 504. 42 U.S.C. § 12201(a).

8. The Rehabilitation Act and the ADA share the same definition of disability. Disability includes:

1. a physical or mental impairment that substantially limits one or more major life activities;
2. a record of such an impairment; or
3. being regarded as having such an impairment.

42 U.S.C. § 12102(1).

9. A qualified individual is an individual who meets the eligibility requirements for participation in the program or activity receiving services. 29 C.F.R. § 32.3.

10. Guilford County Department of Social Services ("DSS") operates a child welfare program receiving federal financial assistance and is subject to Section 504 and its implementing regulations, including 45 C.F.R. § 84.60.

The Final Rule specifically provides:

"No qualified individual with a disability shall, on the basis of disability, be excluded

equal access to reunification services.

26. Mother alleges that Defendants relied upon Plaintiff's disability-related information, assumptions, and stereotypes rather than determining what services, accommodations, or supports were necessary to allow Plaintiff equal participation in the child welfare process.

27. Plaintiff further contends that Defendants denied Plaintiff equal access to child welfare services, including reunification services, by failing to provide reasonable accommodations and by treating Plaintiff's disability as a barrier to reunification.

28. Plaintiff brings this claim against the public entity receiving federal financial assistance for violations of Section 504 of the Rehabilitation Act and 45 C.F.R. § 84.60.

The Final Rule also applies specifically to the child welfare system. The Final Rule provides that:

**"No qualified individual with a disability shall, on the basis of disability, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any child welfare program or activity that receives Federal financial assistance."**

**89 Fed. Reg. 40,188 (May 9, 2024) (codified at 45 C.F.R. § 84.60(a)(1)).**

17 Accordingly, Guilford County Department of Social Services, as a child welfare agency receiving federal financial assistance, is prohibited from excluding Plaintiff from participation in, denying Plaintiff the benefits of, or subjecting Plaintiff to discrimination within the child welfare program on the basis of disability.

18. Plaintiff is a qualified individual with a disability under Section 504 of the Rehabilitation Act and 45 C.F.R. § 84.60 because Plaintiff has a documented mental health disability that was known to Defendants during the child welfare proceedings. Defendants

relied upon Plaintiff's mental health diagnosis throughout the dependency proceedings and made Plaintiff's diagnosis a central focus of DSS's concerns regarding reunification. 19Ms. Ricketts is qualified because she is the biological parent of the minor child, was actively seeking reunification, participated in the child welfare process, requested services, requested accommodations and support related to her disability, and demonstrated a willingness to address the concerns identified by DSS-Guildford. Mental illness did not prevent her from participating in the child welfare program or benefiting from reunification services. Plaintiff sought meaningful access to DSS services, including  requesting to change the standard case plan , and supports necessary to demonstrate her ability to safely parent her child.

20. Accordingly, Plaintiff was a qualified individual with a disability entitled to the protections of Section 504 and 45 C.F.R. § 84.60 but was denied.

21 At the conclusion of the November 8, 2024 Dispositional Hearing, the primary permanent plan for Ms. Ricketts's child was changed from reunification to adoption. Following the change in the primary plan, Guilford County Department of Social Services ("DSS") filed a petition to terminate Ms. Ricketts's parental rights on or about May 1, 2025.

22. Ms. Ricketts alleges that DSS's decision to change the primary plan to adoption and proceed toward termination of parental rights was based upon Ms. Ricketts's documented disability and DSS's continued reliance on Ms. Ricketts's mental health diagnosis rather than an individualized assessment of Ms. Ricketts's ability to safely parent with appropriate supports, services, and reasonable accommodations. This conduct constitutes a violation of 45 C.F.R. § 84.60, which prohibits child welfare agencies receiving federal financial assistance from discriminating against qualified parents with disabilities by

making decisions based on speculation, stereotypes, or generalizations that a parent, because of a disability, cannot safely care for a child.

23. The evidence supporting this claim includes the November 8, 2024 Dispositional Hearing transcript and subsequent post-trial hearing record, where Ms. Ricketts requested that reunification remain the primary permanent plan instead of adoption. Ms. Ricketts requested continued reunification efforts and demonstrated her willingness to participate in services and address DSS concerns. The record further demonstrates that the reunification case plan was not a court-ordered case plan until it became adopted by the Court as a result of the Dispositional Hearing. Prior to the November 8, 2024 Dispositional Hearing, Ms. Ricketts was not subject to a court-ordered case plan.

24. After the Dispositional Hearing, Ms. Ricketts was required to comply with the court-ordered case plan within approximately sixty (60) days while also navigating a documented disability. DSS did not provide reasonable accommodations or modifications necessary to allow Ms. Ricketts equal access to the reunification process.

25. DSS failed to conduct an individualized assessment of Ms. Ricketts's disability-related needs and failed to determine what reasonable supports or accommodations were necessary for Ms. Ricketts to successfully participate in reunification services before changing the permanent plan to adoption and pursuing termination of parental rights.

26. Accordingly, Ms. Ricketts alleges that DSS-Guilford denied her equal access to child welfare services, including family preservation and reunification services, based on disability in violation of Section 504 of the Rehabilitation Act and 45 C.F.R. § 84.60.

**Lastly the Final Rule, discrimination in child welfare programs includes:**

"Decisions based on speculation, stereotypes, or generalizations that a parent, caregiver, foster

parent, or prospective parent, because of a disability, cannot safely care for a child."

89 ed. Reg. at 40,189 (codified at 45 C.F.R. § 84.60(a)(2)(i)).

27. In this case, it is alleged that DSS-Guilford relied upon speculation, stereotypes, and generalizations regarding her documented mental health disability rather than conducting an individualized assessment of her actual parenting abilities, progress, strengths, and ability to safely parent with appropriate supports, services, and reasonable accommodations.

28. Plaintiff that DSS treated her disability diagnosis as evidence of parental incapacity and used disability-related assumptions in making decisions regarding reunification, the permanent plan, and the filing of a petition to terminate parental rights, rather than determining what accommodations or supports were necessary to provide Ms. Ricketts equal access to the child welfare process.

29. Federal disability law provides additional protections to parents with disabilities involved in child welfare proceedings. In 2024, the United States Department of Health and Human Services issued a Final Rule implementing Section 504 of the Rehabilitation Act, expressly prohibiting discrimination against qualified individuals with disabilities in child welfare programs and activities. The Rule recognizes that parents with disabilities have historically faced barriers and adverse treatment within the child welfare system based on stereotypes, assumptions, and a failure to provide reasonable modifications.

30. Under the Final Rule, recipients of federal financial assistance may not deny a

qualified parent with a disability custody, control, or visitation of a child; deny participation in family preservation or reunification services; terminate parental rights on the basis of disability; deny qualified caregivers or prospective foster or adoptive parents with disabilities the opportunity to participate in child welfare programs; or require a child to be placed outside the family home in order to receive necessary services. These protections reflect a clear federal mandate that disability alone cannot serve as a basis for adverse child welfare actions and that agencies must ensure equal access to services and supports necessary to preserve family integrity.

31. Accordingly, where a parent has a qualifying disability, the Court must consider whether the child welfare agency complied with its obligations under Section 504, including the provision of reasonable modifications and equal access to services, before relying upon disability-related factors as grounds for removal, reunification delays, or termination of parental rights.

32. In this case , the Disposition hearing that occurred on November 8,2024 resulted in the DSS-Guilford making a recommendation of adoption instead of leaving reunification as the primary plan. The is in direct violation of 45.C.F.R. § 84.60(b)(1)–(5)

33. Plaintiffs have alleged that County DSS maintains a widespread, corporate custom of completely failing to train its field investigators on the requirements of § 84.60.

---

[1] Discrimination on the Basis of Disability in Health and Human Service Programs or Activities, 89 Fed. Reg. 40,066, 40,189 (May 9, 2024) (codified at 45 C.F.R. § 84.60(b)(1)–(5)).

## SECOND CLAIM FOR RELIEF
## TITLE II OF THE AMERICANS WITH DISABILITIES ACT
## 42 .S.C. § 12131 et seq.

34. Ms. Ms. Ricketts incorporates by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

35. Title II of the Americans with Disabilities Act provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. 35.

36. The County Department of Social Services is a "public entity" within the meaning of Title II, and its child welfare services, including investigations, case planning, reunification services, and placement decisions, constitute "services, programs, or activities" subject to the requirements of the ADA.

37. Ms. Ms. Ricketts is a qualified individual with a disability entitled to the protections of the Americans with Disabilities Act.

38. Child welfare services provided by the Guilford County's Department of Social Services are service, programs, or activities of a public entity. The Department is therefore required to administer its child welfare services in a manner that does not discriminate against Ms. Ms. Ricketts on the basis of disability and must provide equal access to services and reasonable modifications where necessary to avoid discrimination.

39. Title II further includes an "integration mandate," requiring public entities to administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. See 28 C.F.R. § 35.130(d). In the context of

child welfare services, this includes the obligation to provide family preservation and reunification services in a manner that does not unnecessarily separate a parent with disabilities from their child based on disability-related assumptions or systemic barriers to access.

40. Title II also prohibits a public entity from affording a qualified individual with a disability an opportunity to participate in or benefit from services that is not equal to that afforded to others, or providing services that are not as effective in affording equal opportunity to achieve the intended outcomes. See 28 C.F.R. § 35.130(b)(1)(ii)–(iii).

41. The Department is further required to make reasonable modifications to its policies, practices, and procedures when necessary to avoid discrimination on the basis of disability. See 28 C.F.R. § 35.130(b)(7). This includes modifications to case planning requirements, service referrals, documentation practices, and communication methods to ensure meaningful access to reunification services.

42. Despite these obligations,  Ms. Ricketts has been subjected to child welfare determinations and case plan compliance findings that rely heavily on disability-related factors, including mental health diagnosis, treatment documentation disputes, and administrative record gaps, rather than individualized evidence of parenting ability or actual service refusal. To the extent the Department has concluded that Ms. Ms. Ricketts is "not in compliance" with her mental health case plan requirements, such a conclusion is not supported by documented refusal or failure to participate in treatment, but rather appears to be based on incomplete records or administrative documentation issues.

43. The Department has also required or relied upon the procurement of extensive mental health records and documentation as a condition of compliance, without adequately

ensuring that Ms. Ricketts was afforded equal access to services or reasonable modifications necessary to meet case plan requirements. Such practices, if not properly individualized and supported by necessity, risk imposing barriers to reunification that are not imposed on similarly situated parents without disabilities.

43. As a result of the Department's actions, Ms. Ms. Ricketts has been denied equal access to reunification services and has been subjected to child welfare determinations influenced, in part, by disability-related factors without adequate reasonable modification or individualized assessment.

44. Here, Guilford County DSS deprived Ms. Ricketts of meaningful participation in the reunification process by failing to provide an individualized assessment of disability-related concerns and by discounting information she provided regarding her child's medical needs. Additionally, DSS failed to meaningfully consider Ms. Ricketts's statements regarding her child's nutritional needs. Ms. Ricketts informed DSS that the child was lactose intolerant, which was documented in the child's medical records. Rather than engaging in a collaborative process to review medical information and determine appropriate guidance, DSS treated Ms. Ricketts's advocacy regarding her child's health needs as a concern about her parenting judgment.

45. In re Hicks/Brown, 893 N.W.2d 637 (Mich. 2017). The Michigan Supreme Court held that a child welfare agency's reunification efforts were not reasonable where the agency failed to provide accommodations reasonably necessary for a parent with a disability to benefit from services. The court emphasized that the ADA requires modification of standard reunification procedures when necessary to accommodate a qualified parent with a disability.

**Failure to Provide Disability-Related Accommodations During Reunification Services Violated Title II of the ADA**

1. Guilford County DSS failed to provide reasonable modifications necessary for Ms. Ricketts to meaningfully participate in reunification services. Instead of identifying disability-related barriers and providing individualized supports, DSS relied upon Ms. Ricketts's mental health disability as a basis to question her ability to parent.

2. The reasoning applied by the Michigan Supreme Court in In re Hicks/Brown is persuasive. In that case, the Michigan Supreme Court held that a child welfare agency has an obligation under the ADA to ensure that reunification services are reasonably modified to accommodate a parent's disability. The court recognized that reasonable reunification efforts cannot be considered adequate where a parent with a disability is provided standard services without the accommodations necessary for that parent to meaningfully benefit from those services.

3. Similar to Hicks/Brown, Guilford County DSS was aware that Ms. Ricketts's disability was a factor in the reunification process. However, rather than modifying services to address disability-related barriers, DSS treated the disability itself as evidence that Ms. Ricketts could not properly parent.

4. The ADA requires public entities to provide reasonable modifications where necessary to avoid discrimination. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(7). As recognized in Hicks/Brown, child welfare agencies cannot satisfy their obligations by offering standard services while ignoring disability-related barriers

that prevent a parent from benefiting from those services.

5. Accordingly, Guilford County DSS's failure to provide disability-responsive reunification services denied Ms. Ricketts meaningful access to the reunification program and violated Title II of the ADA.

46. In the absence of injunctive or other appropriate relief, Ms. Ms. Ricketts will continue to be subject to discriminatory barriers in the provision of child welfare services, including reunification planning and case plan compliance determinations.

**THIRD CLAIM FOR RELIEF**

**Violation of Procedural Due Process Rights Under the Fourth Amendment**

**.S.C. § 1983 UNREASONABLE SEARCHES AND SEIZURE BY THE GOVENMNENT**

The Fourth Amendment protects individuals—including minors—from "unreasonable searches and seizures". When government officials remove a child from their parents or guardians, this is legally considered a "seizure of a person". For this seizure to be considered reasonable, the government must meet strict legal criteria

Each of the foregoing allegations is incorporated as if fully set forth herein.

1. The Fourth Amendment to the United States Constitution prohibits unreasonable seizures, including the warrantless removal of a child from parental custody by state actors. Such removals constitute a seizure and must be supported by a court order or objectively reasonable exigent circumstances demonstrating a grave and immediate risk of serious physical harm.
2. The Supreme Court has recognized that parental custody is a fundamental liberty interest

protected by constitutional law. *Troxel v. Granville*, 530 U.S. 57 (2000).

3. The Supreme Court has further held that state interference with parental rights is subject to heightened constitutional protection and cannot be justified absent fundamentally fair procedures and sufficient evidentiary justification. *Santosky v. Kramer*, 455 U.S. 745 (1982); *Troxel v. Granville*, 530 U.S. 57 (2000).

4. North Carolina courts likewise require that emergency removal and continued custody determinations be supported by individualized, fact-specific findings consistent with statutory requirements and not based on generalized assumptions or conclusory allegations. *In re Stumbo* (N.C. Ct. App.).

5. Guilford County DSS effected a warrantless seizure of Ms. Ricketts's newborn child while the child at the Moses Cone Hospital located in Greensboro , North Carolina.

6. At the time of removal, Ms. Ms. Ricketts was alone with the newborn in the hospital, actively feeding, observing, and caring for the child without supervision, instruction, or intervention by any third-party provider or state actor.

7. Defendant's subsequent justification improperly assumed supervisory conditions or safety restrictions that were not present at the time of the removal.

8. Under the doctrine of ***Parens Patriae,*** the State's authority to intervene in the parent-child relationship is strictly limited and must be exercised in accordance with constitutional due process protections. Government officials may remove a child without prior judicial authorization only under narrowly defined exigent circumstances, where there is probable cause to believe the child is in immediate danger of abuse, neglect, or severe physical harm, or where lawful parental consent has been voluntarily given. Absent exigency or valid consent, removal of a child is not constitutionally permissible

and violates the parent's fundamental liberty interest in the care, custody, and control of their child.

9. Plaintiff , Capree Ricketts, did not give DSS-Guildford permission to take the newborn.

10. Mother , Capree Ricketts , had a place to stay and would not allow DSS-Guilford entry with out a warrant . This does not justify removal of an entire human being from its mother.11

11. Ms. Ricketts had a temporary provider; however, at the time of the hospital encounter, Ms. Ms. Ricketts was independently performing all caregiving tasks for the newborn without any directive or requirement that she be supervised or restricted in her care of the child. The affidavit of Temporary , attached hereto as **Exhibit B( Under Seal)**, confirms that Ms. Ricketts was not subject to any 24/7 supervision requirement and was actively and independently caring for the newborn at the time of the alleged removal conditions.

12. Through Guilford County DSS, Defendant removed the child without a valid court order authorizing nonsecure custody or emergency removal at the time of the initial seizure.

13. At the time of removal, the child was in a hospital under medical supervision, and upon information and belief, there were no objectively reasonable exigent circumstances demonstrating a grave and immediate risk of serious physical harm sufficient to justify bypassing judicial authorization.

14. CPS investigative case notes and agency records maintained by Guilford County DSS, including records authored by CPS Investigator in the ordinary course of business, document the removal decision, hospital circumstances, custody determination, and subsequent risk assessment, and are attached hereto as Under Seal **Exhibit A** and incorporated herein by reference.

15. CPS documentation reflects that the family was later assessed as presenting a "moderate" level of risk following the removal, which is inconsistent with any claim of imminent danger at the time of seizure. (See Exhibit A, DSS Case Notes of CPS Investigator Under Seal .)

16. Under North Carolina law, nonsecure custody without prior judicial authorization is permitted only upon statutorily defined findings supported by specific facts demonstrating abuse, neglect, or dependency and a substantial risk of serious physical harm requiring immediate removal. N.C. Gen. Stat. § 7B-503.

17. Through the actions described above, Defendant seized Ms. Ms. Ricketts's newborn child without a valid court order and without statutorily sufficient exigent circumstances as required under both the Fourth Amendment and N.C. Gen. Stat. § 7B-503.

18. As applied to these facts, the seizure was not supported by individualized, contemporaneous evidence of imminent danger, but instead relied on generalized assumptions and retrospective justification inconsistent with constitutional standards governing emergency removal (see Tenenbaum v. Williams, 193 F.3d 581, 600 (2d Cir. 1999) (recognizing constitutional protection of the parent-child relationship and requiring governmental intrusion to be justified by sufficient circumstances.

19. As a direct and proximate result of Defendant's actions, Ms. Ricketts and her child suffered deprivation of constitutional rights, including unlawful seizure during the neonatal period and separation without judicial authorization and interference with the parent -child bond and direct violation of the 4th amendment .

---

[1] *Parens patriae* refers to the inherent authority of the State to act as guardian for those unable to protect themselves, including minors; however, this authority is limited by the Due Process Clause of the

Fourteenth Amendment and does not permit removal of a child from parental custody absent exigent circumstances or lawful consent. See generally *Stanley v. Illinois*, 405 U.S. 645 (1972); *Santosky v. Kramer*, 455 U.S. 745 (1982). Warrantless removal of a child is permissible only where officials have probable cause to believe the child is in imminent danger of serious harm, or where a parent voluntarily consents to removal. See, e.g., *Tenenbaum v. Williams*, 193 F.3d 581 (2d Cir. 1999); *Hatch v. Dep't for Children, Youth & Their Families*, 274 F.3d 12 (1st Cir. 2001).

2 Santosky v. Kramer, 455 U.S. 745, 753–54 (1982) (recognizing that parents have a fundamental liberty interest in the care, custody, and management of their children and requiring fundamentally fair procedures before the State interferes with that relationship).

3 Stanley v. Illinois, 405 U.S. 645, 651 (1972) (recognizing the parent-child relationship as a protected liberty interest under the Due Process Clause).

4 Tenenbaum v. Williams, 193 F.3d 581, 600 (2d Cir. 1999) (recognizing constitutional protection of the parent-child relationship and requiring governmental intrusion to be justified by sufficient circumstances).

Exhibit A: DSS Case Notes, Narrative Assessments, and Safety Assessment Records Regarding Investigation and Emergency Removal (September 2023)

1. The records reflect DSS later assessed the family's risk level as "moderate" following removal.
2. The records further reflect DSS consideration of mental health concerns in connection with custody decisions.
3. The records reference involvement of a temporary provider, but do not document any active supervision requirement in effect at the time of the hospital encounter.
4. Exhibit A, B, C,& D is incorporated by reference**( Under Seal**) into the Complaint.

---

## FOURTH CLAIM FOR RELIEF CONTINUED VIOLATION OF FOURTHEEN AMENDMENT

**Child Welfare Proceedings, Federal Disability Mandates, and Fundamental Parental Rights**

*The Child continues to remain in the care and custody of Department of Guilford County without providing Parent the mandatory permanency planning hearings .*

1. At all relevant times, including as the parties approached the six-month permanency hearing required under Family Court Act § 1089(a)(3), Guilford County DSS continued to make determinations affecting Plaintiff's parental rights and access to services.

2. However, the mother , Capree Ricketts has not had a permanency planning hearing since July of 2025.

3. Federal disability law is fully applicable to state and local child welfare systems and governs "anything a public entity does," including the provision of child welfare services (28 C.F.R. Pt. 35, App. B, Subpart A).

4. As a result of this , parent and child has suffered irreparable harm and both the Department of Justice and the Department of Health and Human Services agrees;

The United States Department of Justice and the Department of Health and Human Services have expressly recognized that discrimination against parents with disabilities is "long-standing and widespread," and that "discriminatory separation of parents from their children can result in long-term negative consequences to both parents and their children." DOJ & HHS further emphasize that "[a]ny case of discrimination against parents and caregivers due to their disability is not acceptable." DOJ & HHS, *Protecting the Rights of Parents and Prospective Parents with Disabilities: Technical Assistance for State and Local Child Welfare Agencies and Courts Under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act* (Aug. 2015), available at https://www.ada.gov/doj_hhs_ta/child_welfare_ta.html.

5. Federal guidance further recognizes that the goals of child welfare systems and disability non-discrimination are not in conflict, but instead are "mutually attainable and complementary," and that ensuring equal access to parenting supports increases the likelihood of safe and stable placements for children. Id.

6. Disabled parents, like all parents, possess a fundamental liberty interest in the care,

custody, and management of their children, protected by the Due Process and Equal Protection Clauses of the Fourteenth Amendment. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (citing *Meyer v. Nebraska*, 262 U.S. 390 (1923)).

7. The United States Supreme Court has repeatedly recognized that a parent's interest in the companionship, custody, and care of their children is "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (quoting *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981)).

8. Accordingly, the State may not interfere with parental rights absent a showing of abandonment, surrender, persisting neglect, unfitness, or similarly serious conduct demonstrating utter indifference to the child's welfare. *Matter of Marie B.*, 62 N.Y.2d 352, 358 (1984).

9. These constitutional protections apply equally to parents with disabilities, as disability does not diminish a person's fundamental right to parent or participate fully in society. See 42 U.S.C. § 12102(a)(1).

10. Despite these well-established constitutional and statutory mandates, Guilford County DSS failed to ensure that its policies, practices, and training adequately protected parents with disabilities from discriminatory treatment in the provision of child welfare services.

11. As a result, DSS personnel relied on disability-related assumptions, failed to provide meaningful reasonable accommodations, and did not ensure compliance with federal disability requirements during the pendency of child welfare proceedings, including as the case approached the permanency hearing stage.

## FIFTH CLAIM FOR RELIEF

**Municipal Liability Under Monell Against Guilford County**

1. Failure to Train, Supervise, and Implement Required Child Welfare Procedures Within Guilford County DSS Child Welfare Operations.

2. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

3. Guilford County DSS's Documented Deficiencies in Training, Assessment Practices, Supervisory Oversight, and Agency Accountability

4. North Carolina operates a child welfare system that is state-supervised and county-administered. Through the North Carolina Department of Health and Human Services ("NCDHHS") and the Division of Social Services ("DSS"), the State establishes child welfare policies, standards, training requirements, oversight mechanisms, and monitoring expectations.

5. County Departments of Social Services are responsible for implementing those requirements in the investigation of abuse, neglect, and dependency; the conduct of safety and risk assessments; the provision of services; case planning; and the recommendation and implementation of actions affecting parental rights and the parent-child relationship.

6. Because county DSS agencies exercise authority over fundamental family integrity interests, they are required to maintain systems ensuring that employees are properly trained, supervised, and supported in applying child welfare policies and legal requirements in a consistent and lawful manner.

7. At all relevant times, Guilford County DSS was responsible for maintaining adequate systems of training, supervision, quality assurance, and corrective action within its child welfare division.

8. In 2023, Guilford County DSS was operating under a Corrective Action Plan addressing deficiencies in its child welfare system. Plaintiff's case began in 2023 during the same period that Guilford County DSS had been placed on notice of these deficiencies.[1] The Corrective Action Plan identified deficiencies including: Challenges in Conducting Thorough Assessments; and

**Lack of Ongoing Supervisory Oversight in Accordance With Child Welfare Policy.**[1]

The Corrective Action Plan identified that assessments were not consistently thorough and complete, and that supervisory oversight was not consistently ensuring compliance with policy requirements for evaluation of safety and risk.

The CAP further identified contributing factors affecting assessment and supervision, including caseload pressures, staffing shortages, training limitations, onboarding issues, documentation deficiencies, NC FAST system issues, and supervisor workload constraints.[1]These findings placed Guilford County DSS on notice that systemic deficiencies existed in the agency's ability to ensure accurate assessments, consistent supervision, and compliant child welfare decision-making.

13. Plaintiff alleges that Guilford County DSS failed to ensure that adequate corrective systems were implemented to confirm that identified deficiencies were actually remedied in practice, including whether employees were properly trained after the CAP findings, whether supervisory review was meaningfully conducted, and whether assessment practices improved in a measurable and consistent manner.

14 Plaintiff further alleges that despite notice of these deficiencies, Guilford County DSS failed to ensure that child welfare decisions were consistently based on complete factual investigation, individualized assessment, and properly documented supervisory review.

**B. Failure to Train and Supervise Employees Regarding State and Federal Legal Requirements, Including Disability Nondiscrimination Obligations**

1. Plaintiff alleges that although Guilford County DSS was required to implement corrective measures addressing child welfare deficiencies, those measures did not adequately ensure compliance with all applicable state and federal legal requirements governing child welfare decision-making.

2. Plaintiff alleges that Guilford County DSS failed to ensure that CPS investigators, supervisors, and decision-makers were properly trained and supervised regarding federal disability nondiscrimination requirements applicable to child welfare practice, including:

Title II of the Americans with Disabilities Act ("ADA");Section 504 of the Rehabilitation Act of 1973; and guidance set forth in the Joint Technical Assistance issued by the United States Department of Justice ("DOJ") and the Office for Civil Rights ("OCR"), Protecting the Rights of Parents and Prospective Parents with Disabilities in Child Welfare Systems.[3]

3. The DOJ/OCR guidance explains that child welfare agencies must not rely on assumptions, stereotypes, or generalizations about disability in making child

welfare decisions. Instead, agencies must conduct individualized assessments based on facts, evaluate a parent's actual abilities, consider available supports and services, and provide reasonable modifications when necessary.

4. Plaintiff alleges that Guilford County DSS failed to ensure that these requirements were incorporated into training, supervision, and quality assurance systems used by CPS investigators and supervisors.

5. Plaintiff further alleges that the Corrective Action Plan did not address whether disability-related nondiscrimination requirements were integrated into child welfare training and supervision, despite the agency's responsibility to ensure lawful decision-making in all child welfare assessments.

6. Ms. Ricketts contends this failure resulted in a practice in which disability-related concerns could be interpreted as parental incapacity without adequate evaluation of supports, services, or reasonable modifications that could mitigate identified concerns.

**C. Application of Training and Supervision Failures to Plaintiff's Case**

1. Plaintiff's child welfare case began in 2023 during the same period that Guilford County DSS was operating under the Corrective Action Plan addressing deficiencies in assessment practices and supervisory oversight.[1]

2. Plaintiff alleges that the deficiencies identified in the Corrective Action Plan were reflected in the handling of Plaintiff's CPS investigation.

The case notes maintained by Guilford County DSS and incorporated as Exhibit _A**(<u>Under Seal</u>)** reflect the investigative actions taken in Plaintiff's case.

3. Upon belief, the case was classified as involving a moderate risk assessment, the assessment was incomplete because Guilford County DSS failed to conduct a full individualized evaluation of Plaintiff's circumstances, including available supports and services.

4. Plaintiff alleges that the case notes do not reflect facts establishing that the child was in danger or that Plaintiff was unable to safely care for the child.

5. Plaintiff alleges that instead of conducting a complete assessment, Guilford County DSS relied on assumptions regarding Plaintiff's circumstances rather than a fully developed factual investigation.

6. The CPS investigator, failed to gather critical information necessary for a complete assessment, including: failing to interview hospital staff regarding visitors who came to see Plaintiff and the child during the hospital stay; failing to determine whether emergency contact or next-of-kin information was available or documented; failing to document efforts to identify available supports, services, or community resources.

7. Plaintiff further alleges that Guilford County DSS did not ensure adequate procedures were in place to identify emergency supports or next-of-kin resources in the event Plaintiff became medically incapacitated.

8. Guilford County DSS also failed to explore reasonable supports and services that could have addressed concerns raised in the assessment, including:

contacting Plaintiff's landlord regarding housing stability concerns and potential assistance resources ;identifying available housing support programs; offering emergency housing resources; and providing ongoing supportive services such as peer support.

9. Plaintiff alleges that these omissions reflect the same deficiencies identified in the Corrective Action Plan, including incomplete assessments, insufficient supervisory oversight, and inadequate documentation of investigative decision-making.

10 Plaintiff alleges that rather than conducting an individualized assessment of Plaintiff's circumstances, abilities, and available supports, Guilford County DSS relied on assumptions regarding disability and parenting capacity.

11. Plaintiff contends that such reliance is inconsistent with federal disability nondiscrimination requirements, which require individualized assessment and consideration of supports and reasonable modifications.

12 Plaintiff alleges that the failure to train and supervise employees regarding these requirements resulted in Plaintiff being evaluated without the full protections required under applicable law and policy.

Guilford County Department of Health and Human Services, Corrective Action Plan (2023). The Corrective Action Plan identified deficiencies within Guilford County DSS child welfare operations, including "Challenges in Conducting Thorough Assessments" and "Lack of Ongoing

Supervisory Oversight in Accordance With Child Welfare Policy." The Corrective Action Plan identified concerns regarding the agency's ability to consistently conduct thorough assessments, gather sufficient information, evaluate safety and risk, document decision-making, and ensure adequate supervisory review.

The Corrective Action Plan identified contributing factors affecting assessment and supervisory practices, including vacancy rates, caseload size, assignment rates of new cases, NCDSS training timeframes, county-specific onboarding requirements, training availability, NC FAST onboarding issues, abbreviated and/or inconclusive documentation, documentation of staffing's, new staff learning curves, supervisor learning curves, staffing shortages, supervisory workload issues, and supervisors carrying cases while performing supervisory responsibilities.

The Corrective Action Plan required corrective measures addressing assessment practices, supervisory oversight, training, documentation, quality assurance review, and implementation of child welfare policy requirements.

Source: Guilford County Department of Health and Human Services, Corrective Action Plan (2023).

bloximages.newyork1.vip.townnews.com

[2] Plaintiff's Guilford County DSS CPS Case Notes and Investigative Records (attached as Exhibit _A( **Under seal** ). The case notes and investigative records are cited as evidence supporting Plaintiff's allegations regarding the CPS investigation, including the actions taken by Guilford County DSS, information gathered during the assessment, risk assessment findings, documentation of investigative efforts, consideration of available supports and resources, and decisions made concerning Plaintiff and her child.

[3] United States Department of Justice ("DOJ") and United States Department of Health and Human Services Office for Civil Rights ("OCR"), Joint Technical Assistance, Protecting the Rights of Parents and Prospective Parents with Disabilities in Child Welfare Systems. The Joint Technical Assistance explains that child welfare agencies must comply with federal disability nondiscrimination requirements and may not rely on assumptions, stereotypes, or generalizations about a parent's disability. Agencies must conduct individualized assessments, evaluate the parent's actual abilities, consider available supports and services, and provide reasonable modifications when necessary to ensure equal access to child welfare services.

## D. Relevance and Materiality of Disability-Discrimination Research to Plaintiff's Claims

1. The research discussed herein is relevant and material because Plaintiff alleges that Guilford County DSS relied upon disability-related assumptions, failed to provide reasonable accommodations, and failed to conduct an individualized assessment of Plaintiff's actual

parenting abilities. The issues addressed in these studies are therefore directly related to the factual and legal questions presented in this case.

2. The research demonstrates that disability continues to influence child welfare and parental-rights determinations and that child welfare systems have historically relied upon assumptions regarding disability rather than individualized assessments of actual parenting capacity.[2] The research further demonstrates that disability alone is not a predictor of child maltreatment, neglect, or inability to parent.[3] This finding is significant because Plaintiff alleges that disability and mental health history were treated as risk factors in this case despite evidence of Plaintiff's participation in services, visitation, housing stability, efforts toward reunification, and advocacy for the child's medical needs.

3. Research involving parents with disabilities, attorneys, and child welfare professionals found that parents with disabilities frequently experience bias during child welfare proceedings. Participants reported that disability-related characteristics were often interpreted as evidence of parental unfitness rather than evaluated through an individualized assessment of actual parenting behavior.[4]

4. The same research found that child welfare agencies frequently provide standardized services without modifications tailored to a parent's disability, creating barriers to successful reunification.[5] The authors concluded that individualized supports, disability-competent services, and accommodations are necessary to ensure equal participation by parents with disabilities in child welfare proceedings.

5. These findings are material to Plaintiff's claims because Plaintiff repeatedly disclosed a disability and sought assistance during the pendency of the child welfare case.

6. Plaintiff alleges that requests for accommodations were ignored or inadequately addressed and that Defendants failed to modify services and procedures to provide meaningful access to reunification efforts. Plaintiff further alleges that disability-related concerns and mental health history were emphasized while Plaintiff's demonstrated parenting abilities, participation in services, visitation history, housing stability, and efforts toward reunification were minimized or disregarded.

7. The cited research does not itself establish discrimination. Rather, it provides relevant evidence that the conduct alleged by Plaintiff is consistent with a documented pattern recognized by scholars, attorneys, disability-rights advocates, and child welfare professionals. Specifically, the research identifies a recurring pattern in which parents with disabilities are subjected to disability-based assumptions, denied appropriate accommodations, evaluated according to stereotypes rather than individualized assessments, and placed at increased risk of adverse child welfare outcomes.[7]

* *Accordingly, the research supports Plaintiff's contention that Defendants' actions should be examined for the influence of disability-related bias, failure to accommodate, and reliance upon generalized assumptions regarding disability. The research makes it more probable that the treatment alleged by Plaintiff was not the result of a neutral and individualized assessment, but was influenced by the same forms of disability discrimination documented throughout the child welfare system.*

---

**Footnotes**

[1] Robyn M. Powell, *Legal Ableism: A Systematic Review of State Termination of Parental Rights Laws*, 101 Wash. U. L. Rev. 423, 423, 439–44 (2023).

[2] Id. at 470–72.

[3] Id. at 470 n.272.

[4] Sasha M. Albert & Robyn M. Powell, *Supporting Disabled Parents and Their Families: Perspectives and Recommendations from Parents, Attorneys, and Child Welfare Professionals*, 15 J. Pub. Child Welfare 529, 537–39 (2020).

[5] Id. at 540–41.

[6] Id. at 541–44.

[7] Powell, supra note 1, at 470–72; Albert & Powell, supra note 4, at 537–44.

## E. Persistent Practice and Custom of Generalized Risk-Based Removals

1. Guilford County DSS maintained a persistent and widespread practice of making emergency removal and custody determinations based on generalized safety concerns rather than documented, individualized findings of imminent risk.
2. DSS decision-making routinely relied on categorical or discretionary labels, including generalized "safety concerns" and parental capacity judgments, without requiring documented factual findings establishing exigent circumstances.
3. This practice resulted in emergency removals followed by continued custody without meaningful individualized reassessment or timely correction through supervisory or judicial safeguards.
4. As a result, the removal and continued separation of children from parents operated not as isolated incidents, but as a recurring operational pattern within DSS child welfare practice.

## F. Application to Plaintiff's Case (Operationalization of Systemic Failures)

1. Plaintiff's case arose during the period in which Guilford County DSS was operating under the

Corrective Action Plan addressing known deficiencies in assessment and supervisory oversight.[1]

2. CPS investigations require DSS employees to conduct individualized assessments, gather complete information, identify available supports and services, document investigative steps, and obtain meaningful supervisory review before depriving parents of custody.

3. The CPS case notes in Plaintiff's matter are incorporated by reference and constitute the official record of DSS's investigation and decision-making.[2]

4. The case notes reflect a "moderate risk" classification; however, DSS failed to complete a constitutionally adequate individualized assessment of Plaintiff's circumstances, including available supports and mitigating services.[2]

5. The investigation did not document facts establishing that Plaintiff was unfit or unable to safely care for her child. Instead, DSS proceeded without evaluating whether identified concerns could be addressed through available supports, services, or accommodations.

6. The assigned CPS investigator failed to obtain or evaluate critical information necessary for a constitutionally adequate assessment, including failure to identify emergency contacts, failure to interview relevant hospital personnel, and failure to document available family or community supports.

7. All of the state actors involved in this case, plaintiff alleges at all failed to offer meaningfully explore less restrictive alternatives, including housing assistance, emergency housing resources, and supportive services that could have mitigated identified concerns.

8. DSS-Guilford County did not offer a safety plan and instead participated in a custom practice that removes children without notice of hearing and routinely files petitions that day of the non-secure hearings

9. These omissions reflect the same systemic deficiencies identified in the Corrective Action Plan, including failures in assessment integrity, documentation, supervision, and implementation of child welfare safeguards.[1]

10. Plaintiff's case therefore reflects the direct implementation of Defendant's deficient policies,

customs, and training failures.

## G. Causation and Moving Force

1. Defendant's policies, customs, and failures in training and supervision were the moving force behind the deprivation of Plaintiff's constitutional rights.
2. As a direct result of these systemic failures, DSS employees made custody determinations without constitutionally adequate individualized assessment, without meaningful supervisory review, and without proper evaluation of available less restrictive alternatives.
3. But for these systemic deficiencies, Plaintiff would not have been subjected to removal and continued separation without constitutionally required procedural safeguards.

11. The pattern of conduct alleged herein was not isolated or the result of individual caseworker error, but was the foreseeable and inevitable consequence of Guilford County DSS's failure to implement constitutionally adequate training, supervision, and corrective enforcement mechanisms requiring individualized assessment and exigency-based justification prior to the removal or continued separation of children from their parents. By failing to ensure that employees were trained, supervised, and required to apply these constitutional standards in practice, Defendant created a systemic decision-making environment in which the deprivation of parental rights without adequate procedural safeguards was a predictable and recurring outcome, thereby constituting deliberate indifference to the risk of violations of the Fourteenth Amendment. This federal court also agrees that "Courts have long upheld the fundamental right to family unity. Any action to remove children without imminent harm or judicial process is unconstitutional under the Fourteenth Amendment"( BEIRLEY et al v. GUILFORD COUNTY DEPARTMENT OF SOCIAL SERVICES et al, No. 1:2025cv00589 - Document 6 (M.D.N.C. 2025)."

## H. Injury

1. As a direct and proximate result of Defendant's conduct, Plaintiff was deprived of her

fundamental liberty interest in the care, custody, and control of her child without constitutionally adequate due process and suffered resulting damages.

2. Plaintiff is entitled to compensatory damages, attorneys' fees, costs, and such further relief as the Court deems just and proper.

---

[1] North Carolina Department of Health and Human Services, Corrective Action Plan for Guilford County DSS (May 2023), https://www.ncdhhs.gov/

[2] Guilford County DSS CPS Case Notes (Plaintiff's Case), **Exhibit (Under Seal)**

## Statement of Claim Six – VIOLATION OF 42 U.S.C. § 1983)

1. Plaintiff re-alleges all prior paragraphs
2. Defendants, acting under color of state law, deprived Plaintiff of rights secured by the Fourteenth Amendment, including due process and familial association, by wrongfully investigating, removing, and/or retaining custody of Plaintiff's child without adequate legal justification. Individual's ought to have known or did know the removal and continue removal is against State Policy as evidence by corrective action plan 2023. Between 2006 and 2015 and overwhelming rate of removals was due to " inability to cope".
3. Mother, Capree Ricketts , states that DSS-Guilford practices emergency removals and was deprived of the parent child relationship as a result of this violation.

## STATEMENT OF CLAIM SEVEN CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS

## 42 U.S.C. § 1985(3)

1. Plaintiff realleges all prior paragraphs.
2. Defendants engaged in a conspiracy, consisting of an agreement or meeting of the minds, to interfere with Plaintiff's civil rights as result of a pattern/custom/and policy .

3. The object of the conspiracy was to deprive Plaintiff of equal protection of the laws and/or equal privileges and immunities under the law mainly due to documented disability .

4. Defendants committed overt acts in furtherance of the conspiracy, including but not limited to:

- Filing or relying on false reports as evidence by case notes versus what was written in the case plan and petition.
- Coordinating removal of the child a routine practice of DSS-Guilford without judicial order.
- Misrepresenting facts to the court or juvenile authorities by stating the child was at imminent risk when the risk was not imminent by " moderate".

5. The conspiracy was motivated by discriminatory animus toward a protected class (required element under § 1985(3)).

6. As a direct result, Plaintiff suffered deprivation of constitutional rights, emotional distress, and separation from her child ; facing now termination of parental rights due to documented disability.

## INJUNCTIVE RELIEF, STANDING, AND PRELIMINARY INJUNCTION

1. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.
2. Plaintiff seeks declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 to prevent ongoing and future violations of her rights under the Fourteenth Amendment.
3. Federal courts have authority to grant prospective injunctive relief to prevent ongoing or

imminent constitutional violations by state and local government actors. *Ex parte Young*, 209 U.S. 123 (1908).

**A. Standing**

4. Plaintiff has standing to seek injunctive relief because she has suffered a concrete injury in fact, including the removal and continued interference with her fundamental liberty interest in the care, custody, and control of her child.
5. Plaintiff's injuries are directly traceable to Defendant's policies, customs, practices, and systemic failures in training and supervision governing child welfare decision-making.
6. Plaintiff's requested injunctive relief is redressable because an order requiring Defendant to implement constitutionally adequate training, supervision, individualized assessment procedures, and lawful decision-making safeguards would reduce the risk of future constitutional violations.
7. Plaintiff further has standing because Defendant continues to exercise authority over child welfare investigations, custody determinations, and reunification processes affecting Plaintiff, creating a real and immediate threat of future harm.

**B. Irreparable Harm**

8. Plaintiff will suffer irreparable harm in the absence of injunctive relief because the deprivation or interference with the parent-child relationship constitutes harm to a fundamental liberty interest that cannot be adequately compensated by monetary damages.
9. The Supreme Court recognizes the parent-child relationship as a fundamental liberty interest protected by the Fourteenth Amendment. *Troxel v. Granville*, 530 U.S. 57

(2000); *Santosky v. Kramer*, 455 U.S. 745 (1982).

10. Procedural due process violations in the context of child removal and custody determinations create an ongoing risk of erroneous deprivation of fundamental rights that cannot be remedied after the fact. *Mathews v. Eldridge*, 424 U.S. 319 (1976).

11. Plaintiff further alleges that Defendant's ongoing policies and practices create a substantial risk of continued separation and potential termination of parental rights, which would permanently and irreversibly sever the parent-child relationship.

**C. Likelihood of Success on the Merits**

12. Plaintiff is likely to succeed on the merits because Defendant's policies, customs, and practices violate the Fourteenth Amendment by permitting deprivation of parental rights without constitutionally required procedural safeguards.

13. The Due Process Clause requires fundamentally fair procedures before the government may interfere with a parent's fundamental liberty interest in the care, custody, and control of their children. *Santosky*, 455 U.S. at 753–54.

14. Plaintiff alleges that DSS decision-making operates through generalized risk assessments and categorical judgments rather than individualized findings of imminent danger, resulting in an unconstitutional risk of erroneous deprivation.

15. These systemic deficiencies were known to Defendant through the 2023 Guilford County DSS Corrective Action Plan, which identified failures in assessment practices and supervisory oversight, placing Defendant on notice of constitutional risk.

16. Despite this notice, Defendant failed to implement adequate corrective measures, resulting in deliberate indifference to the risk of constitutional violations under *City of Canton v. Harris*, 489 U.S. 378 (1989), and *Connick v. Thompson*, 563 U.S. 51 (2011).Plaintiff therefore alleges a substantial likelihood of success in demonstrating that Defendant's policies and practices violate the Fourteenth Amendment.

**D. Balance of Equities**

17. The balance of equities strongly favors Plaintiff because the harm to Plaintiff—ongoing interference with the fundamental right to family integrity and risk of permanent termination of parental rights—far outweighs any administrative burden on Defendant in implementing constitutionally required training and procedural safeguards. By contrast, Plaintiff faces ongoing and potentially irreversible harm if Defendant's practices continue unchecked.

**E. Public Interest**

18. The public interest strongly favors injunctive relief because the protection of constitutional rights, particularly fundamental parental rights, is always in the public interest.

19. Ensuring that child welfare systems comply with constitutional due process requirements enhances, rather than undermines, child safety by promoting accurate, individualized decision-making and reducing erroneous removals.

20. The public has no interest in the enforcement of unconstitutional policies or practices that risk unnecessary separation of families without adequate procedural safeguards.

**F. Least Intrusive Relief / Narrow Tailoring**

21. The injunctive relief sought is narrowly tailored to address only the constitutional deficiencies identified in this action and does not seek to interfere with Defendant's lawful child welfare functions.

22. Plaintiff seeks prospective relief requiring Defendant to implement constitutionally adequate training, supervision, individualized assessment procedures, and lawful decision-making safeguards consistent with the Fourteenth Amendment.

23. Such relief is the least intrusive means necessary to remedy ongoing constitutional violations and ensure compliance with federal law while preserving Defendant's discretion to administer child welfare services.

24. The requested relief does not require the Court to oversee individual child custody determinations but instead addresses systemic deficiencies in training, supervision, and decision-making procedures that create an ongoing risk of constitutional harm.

**G. Conclusion**

25. Absent injunctive relief, Plaintiff will continue to face a substantial and ongoing risk of deprivation of her constitutional rights, including the potential for continued separation and termination of parental rights without constitutionally adequate procedural protections.

26. Plaintiff therefore respectfully requests that this Court grant declaratory and injunctive relief to prevent further irreparable harm and ensure compliance with the Fourteenth Amendment.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and grant the following relief:

A. Declare that Defendants violated Plaintiff's rights under the Fourteenth Amendment to the United States Constitution, enforceable through 42 U.S.C. § 1983;

B. Declare that Guilford County is liable under Monell v. Department of Social Services for the constitutional violations suffered by Plaintiff;

C. Declare that Defendants violated Title II of the Americans with Disabilities Act by discriminating against Plaintiff on the basis of her documented disability and by failing to provide reasonable modifications and accommodations in the administration of child welfare services and reunification efforts;

D. Declare that Defendants violated Section 504 of the Rehabilitation Act by excluding Plaintiff from participation in, denying Plaintiff the benefits of, or otherwise discriminating against Plaintiff in programs and activities receiving federal financial assistance because of her disability; that the parties are in violation of 45 C.F.R. § 84.60(b)(1)–(5) and violation of Title II American Act.

E. Enter judgment pursuant to Rule 57 of the Federal Rules of Civil Procedure, declaring unconstitutional and unlawful:

1. The County violation of the Plaintiff's right to be free of unreasonable seizures under the Fourth Amendment;

2. The County's violation of the Plaintiffs' and Classes' procedural due process rights under the Fourteenth Amendment;

3. The County's violation of Parent Plaintiffs' and the Parents' Class's substantive due process rights under the Fourteenth Amendment; and provide appropriate equitable and injunctive relief to remedy the County's unconstitutional policy, practice, and custom of abusing the emergency removal power in violation of Plaintiffs' constitutional rights.

F. Enter preliminary and permanent injunctive relief requiring Defendants to cease discriminatory and unconstitutional practices; provide reasonable accommodations and modifications necessary for Plaintiff's meaningful participation in all child welfare services, visitation, case planning, reunification services, and court-related processes; and take all appropriate corrective actions necessary to remedy the effects of Defendants' unlawful conduct and ensure Plaintiff has an equal opportunity to reunify with her child;

G. Award Plaintiff reasonable attorney's fees, costs, and expenses pursuant to applicable law; and

H. Grant such other and further relief as the Court deems just and proper.

This ~~26~~ 23 of June,2026.

Respectfully submitted,

Capree Ricketts

Capree Ricketts

~~407 East Washington~~ St. (111 Lunsford Dr

~~Greensboro, NC 27401~~ Burlington, NC 27217)

~~capreericketts@yahoo.com~~

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF NORTH CAROLINA

GREENSBORO DIVISION

Capree Ricketts,

Plaintiff,

v.

Case No.

[Department of Social Services

Guilford County],

Defendant(s).

**VERIFICATION OF COMPLAINT**

I, [Capree Ricketts], the Plaintiff in this action, declare as follows:

1. I am the Plaintiff in this matter and am competent to make this declaration.

2. I have read the foregoing Complaint and understand its contents

3. The statements of fact contained in the Complaint are true and correct to the best of my personal knowledge, and where not based on personal knowledge, I believe them to be true based upon information available to me

4. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 23 day of June, 2026, at 9am.

Capree Ricketts

[Capree Ricketts], Plaintiff( *Pro Se*)